■ DUOBOND CORPORATION, Appellant, v CONGRESS FACTORS CORPORATION, Respondent.—In an action by an assignor of accounts receivable against its assignee to recover, *inter alia*, the amounts allegedly wrongfully "charged back" to plaintiff's account, which amounts represent advance payments made by defendant to plaintiff, plaintiff appeals from a judgment of Supreme Court, Kings County, entered April 11, 1975, in favor of defendant, following a nonjury trial. Judgment reversed, on the law and facts, with costs; the issues of liability are hereby determined in favor of plaintiff; and new trial granted solely as to the issue of damages. Plaintiff Duobond Corporation (Duobond) is a textile finisher. On December 20, 1971 it entered into a "discounting factoring agreement" with defendant Congress Factors Corporation (Congress). The printed form of agreement was furnished by Congress. The agreement contained the following relevant

provisions: (1) Duobond indemnified Congress against all loss "caused by * * * rejection of goods and claims of every kind and nature by purchasers, other than loss * * * resulting from financial inability of the purchaser to pay"; (2) Duobond agreed to "promptly adjust all disputes with purchasers and promptly advise [Congress] of the same upon [Duobond's] receiving notice thereof"; (3) Congress "shall have the right to charge the disputed account or accounts back to [Duobond] together with interest from the date of original credit"; (4) the chargeback was not to be deemed a reassignment of the accounts, and title thereto was not to be deemed a reassignment thereof until Congress was fully reimbursed; (5) the agreement "may be modified only in writing" signed by both parties; and (6) a waiver of any term "shall be in writing". Pursuant to this agreement, Duobond assigned accounts receivable from its debtor, Herman Zucker Textile Co., Inc. (Zucker), to Congress, in connection with certain finishing work it had done on textiles furnished to it by Zucker and Zucker's affiliate corporation. The textiles were designated as "Style 271 goods". The billings therefor were set forth in invoices dated variously in February and March, 1972. Zucker paid Congress in full on these invoices on April 24, 1972. Duobond had no specific knowledge of such payment. Thereafter, Duobond finished another set of textiles furnished by Zucker and its affiliates. There were 67 invoices in connection with this latter set, in the total amount of $15,459.24; these were each assigned to Congress on their dates of issuance, April 1, 1972 to August 7, 1972; payment on each was due within 30 days. None were paid. On October 31, 1972 Congress charged back to Duobond the sums it had advanced on these 67 invoices. It did so as a sequela of the "notice of customer dispute", dated August 10, 1972, which it had sent to Duobond, in which it had listed the then past due 64 of the 67 invoices. Under the heading "explanation of dispute" in that notice it stated that Zucker "claims that all bills are in dispute—that goods bled and are going to be tested by independent adjustors." The notice contained the printed statement, "the below named customer has refused payment of the following invoice(s) because of a dispute. Please note that all items in dispute must be adjusted by you with the customer within 30 days. If unresolved this item(s) will be charged to your account." In fact, the "dispute", as eventually clarified, did *not* relate to the goods represented by the 67 invoices, but to the Style 271 goods, which Congress had recently factored and been paid for. However, this was not known to the Congress employee, Mr. Fries, who had been newly employed in June, 1972 and to whom had been assigned the collection of the 67 invoices from Zucker. On August 17, 1972 Mr. Fries wrote an inter-office memorandum wherein he stated that while he, Mr. Fries, had been on vacation that summer, Bruce Bloom (another Congress employee) had spoken to Mr. Zucker about these invoices and that the latter "now claims that all the Duo-Bond bills are in dispute", that the goods bled, and an independent adjuster was in the process of testing the merchandise. It was apparently on the basis of this information that Congress sent the August 10, 1972 notice of dispute to Duobond. On August 18, 1972, Duobond's president, Mr. Sandor, wrote to Mr. Fred Zucker that he had received notice that Zucker was "withholding payments of over $15,000.00—for claims"; that he had been attempting, without success, to meet with him "to find out and discuss the exact nature and extent of your alleged claim—in vain"; that "we did not receive any notification of any claim from you to date", and that "We understand from word of mouth information that your claim is on *Style 271*, color *Brown/White* bleeding" (underlining in letter); that Duobond had recleaned such goods at Zucker's request and they came

back without discoloration; and that such recleaning corrected the condition "whether it was a yarn fault or not." (The significance of this is that, if a yarn fault had been present, the goods would have been defective when they were originally delivered to Duobond for finishing.) In the meantime, Mr. Fries also found that Mr. Zucker was not returning his calls. Therefore, on August 22, 1972, he made a personal visit to Mr. Zucker to discuss the Duobond account, as well as another account, Globe Dye Works. Mr. Zucker made arrangements to pay the Globe Dye bills, but as to the Duobond account, he iterated that he had "a merchandise problem" and showed him a laboratory report "which stated the case for his problem with the Duobond goods". Mr. Fries wrote to Duobond, informing it of his visit, and that Mr. Zucker had given him "correspondence regarding the goods in question" and had requested an independent tester to "look at the merchandise." On August 21, 1972 Duobond received 71 pieces for refinishing from Zucker. On August 24, 1972 Duobond wrote to Zucker that "the goods continued to let color every time they were recleaned" but that "this problem was adjusted between yourselves and Thomas Knitting Mills before these goods were run originally" and that there appeared to be something wrong with the dye (for which, apparently, Duobond was not responsible). Again, on August 28, 1972, Duobond wrote to Zucker referring to three pieces of goods being sent for "re-dry cleaning" and Duobond's conviction that the problem was in the dye. Once more, on September 22, 1972, Duobond's letter to Zucker pinpointed the dye as the cause of the bleeding, as demonstrated in a report of the Dow Chemical Company. This letter concluded, "we are anxious to resolve this problem, which as you know is very costly for both of us." On that same day, Mr. Sandor advised Mr. Fries that he expected to have this problem straightened out within a week. Mr. Sandor thereafter made continual calls to Zucker, which were unanswered. On October 9, 1972 he wrote to ask "when and where can we inspect these goods", but received no reply. The correspondence makes clear that Duobond knew that the claims made by Zucker related to alleged defects in the Style 271 goods; the only issue, so far as Duobond was concerned, was whether the defect, the bleeding, was the fault of its finishing process. Duobond claimed it had proof that the defect was not the result of that process. However, it seems just as clear that Mr. Fries did not know that the "dispute" related to Style 271 goods. The record is clear that Mr. Fries had no knowledge of the factoring by Congress, and the full payment to it, of the Style 271 invoices. It was because of this lack of knowledge (by Mr. Bloom as well) that the August 10, 1972 "notice of dispute" listed those of the 67 invoices which were then due as the subject of the merchandise dispute. Duobond's failure to advise Congress that Zucker's complaint related to an earlier set of shipments is the result of its having been unaware that Mr. Fries had no knowledge of Congress' factoring of the Style 271 goods. Duobond therefore apparently assumed that Congress knew what it was doing when it stated that the merchandise dispute alleged by Zucker was a proper basis for Congress' "notice of dispute" as to the then due invoices and the subsequent chargeback thereon. Further, Duobond had no specific knowledge that Congress had received payment in full for the Style 271 goods. Had Congress known that Zucker's claim of dispute related to prior shipments on which it had received payment, it would not have charged the 67 invoices back to Duobond. However, it could have sued Zucker on those invoices, and would, undoubtedly, have been awarded summary judgment dismissing any counterclaim or claimed offset on the principle that such claims as to prior shipments are irrelevant in an action by the factor against the debtor (see,

e.g., *Iselin-Jefferson Fin. Co. v Makel Textiles,* 21 AD2d 758). The "dispute" remained unsettled. Congress, after charging back the amounts of the invoices on October 31, 1972, refused Duobond's oral requests that it sue Zucker; Duobond thereupon instituted its own suit against Zucker, after receiving a requested written assignment of the 67 invoices. The complaint recited the assignment to, and reassignment from, Congress and asserted that Duobond was now the owner of these invoices and "entitled to assert the claim for payment thereof." Zucker asserted alleged defects in the Style 271 goods as a counterclaim. After much travail, including a successful appeal to this court on the denial of its motion for summary judgment *(Duobond Corp. v Zucker Textile Co.,* 42 AD2d 961), but nevertheless having to proceed to trial on the counterclaim, Duobond obtained judgment on November 15, 1973 for $17,265.77, the total sum of the 67 invoices, plus interest and costs, and dismissing the counterclaim. However, on the previous day, at a meeting of Zucker's creditors, Zucker's attorney was instructed to commence a chapter 11 proceeding pursuant to the bankruptcy laws. Duobond filed proof of claim in the chapter 11 proceeding and (as of the time of the trial herein) has recovered a 10% dividend. On January 9, 1974 Duobond made formal demand to Congress for payment of its loss. It claimed that there had been no dispute as to the invoices "which had already been paid to you on April 26, 1972 (i.e., #271 goods)"; that Zucker was in financial straits in the summer and fall of 1972; that Zucker had used the excuse of merchandise dispute to delay payment; and that Congress had been aware, in 1972, of circumstances indicating Zucker's financial distress. Receiving no redress, Duobond instituted this suit. Our review of the evidence convinces us that Congress' claim of merchandise dispute and the subsequent chargeback was not venal and that it was not based on awareness of Zucker's financial difficulties. It was, however, the result of a distressing failure on Congress' part to ask the proper questions, both of the debtor and of its assignor. Congress, as a disembodied entity, knew of the earlier payments for the Style 271 goods, but acted as though it lacked such knowledge. In August, 1972 Congress was the owner of the 67 invoices and, although it did not have the expertise to ascertain the cause of the bleeding of the goods, it required no expert knowledge to ascertain whether the goods as to which these complaints were made were the *subject* of the 67 invoices. Since Congress had delegated collection of these invoices to employees who did not know of the earlier shipments, it should have acquainted them with the recent history of the account. This would have alerted them to inquire whether the dispute was as to the present shipment or as to previous shipments. With hindsight, it seems that Duobond's knowledge—that the only complaints raised by Zucker related to the prior shipment—could easily have been conveyed to Congress. However, Duobond had no expertise as to whether alleged defects in prior shipments could be a relevant basis for a merchandise dispute as to a later shipment. That was the factor's bailiwick. Duobond had the right to assume that Congress knew of the prior shipments so recently factored by it. Further, Duobond had not been told (and, of course, there was no requirement that Congress tell it) that the invoices as to the prior Style 271 shipments had been paid to Congress. Duobond's error, its contribution to the failure in the channels of communication, was its unquestioned acceptance of Congress' assertion that the merchandise dispute properly applied to Zucker's nonpayment of the 67 invoices. Had Duobond been more aggressive in challenging Congress' assertion to that effect, the true situation would have been uncovered and, most probably, neither party would have suffered any loss. In balancing the

"negligence" of the two innocent parties herein, we conclude that the greater negligence is that of Congress, since it, as the then owner of the account, had the minimal obligation of determining whether the alleged dispute raised by the debtor related to the account in question. Congress' recent dealings with the debtor should have alerted it to the true facts. Even were we to conclude that their "negligence" was equal, we would nevertheless hold Congress liable for the loss on the equitable principle that "where litigants assert conflicting claims, and hence, loss or prejudice must be borne by one of them, the decision in the event that they are shown to have been equally 'innocent'—that is, ignorant of the harmful consequences of their acts—must be rendered against the party whose conduct brought about the prejudicial situation" (27 Am Jur 2d, Equity, § 146). The initiator of the "prejudicial situation" was Congress when, on August 10, 1972, it incorrectly advised Duobond that there was a merchandise dispute raised by the debtor relating to the nonpayment of the 67 invoices. We do not agree with Trial Term's conclusion that Duobond's request to Congress for reassignment of the invoices as a preliminary to Duobond's suit against Zucker, and all that followed in Duobond's attempt to recover on the 67 invoices (including filing a claim in the bankruptcy court and receipt of a dividend on its judgment), constituted a waiver of its rights to protest the chargeback, as well as a waiver of the nonwaiver provisions of the factoring agreement prepared by Congress. All these acts were the normal sequelae of Duobond's acceptance of the word of its factor that the dispute raised by the debtor was a proper basis for the chargeback. There clearly was no "intentional abandonment or relinquishment of a known right" (Alsen's Amer. Portland Cement Works v Degnon Contr. Co., 222 NY 34, 37) and no "deliberate, informed abandonment of known rights" (Matter of McGlone, 171 Misc 612, 620, revd 258 App Div 596, revd and reinstated, 284 NY 527, affd sub nom Irving Trust Co. v Day, 314 US 556). Nor did the conduct of Duobond constitute an estoppel against protest of the chargeback. Its criticized conduct was based on its having been negligent in accepting Congress' assertion that the merchandise dispute was relevant to Zucker's nonpayment of the 67 invoices. This is too weak a reed upon which to base a claim of estoppel. It is to be noted, also, that Congress makes no claim that Duobond was dilatory in pursuing its claim against Zucker. Rabin, Acting P. J., Cohalan, Margett, Brennan and Shapiro, JJ., concur.